UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ARTHUR PROVENCHER, MICHAEL          :
McGUIRE and RONALD MARTEL,          :
on behalf of a class,               :
                                    :
          Plaintiffs,               :
                                    :
v.                                  :    Case No. 2:22-cv-198
                                    :
BIMBO BAKERIES USA, INC. and BIMBO  :
FOODS BAKERIES DISTRIBUTION LLC,    :
                                    :
          Defendants.               :

## OPINION AND ORDER

Plaintiffs in this case — distributors of Defendant Bimbo Bakeries' products — filed suit against Bimbo Bakeries alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), and Vermont Employment Practices Act, 21 V.S.A. § 384. Bimbo filed a motion for judgment on the pleadings as to Plaintiffs' Vermont labor law claim and asserted a counterclaim for unjust enrichment. Plaintiffs and Plaintiff-Intervenor Department of Labor filed motions to dismiss the counterclaim. For the following reasons, Bimbo's motion for judgment on the pleadings is **denied** and Plaintiffs' motion to dismiss the counterclaim is **granted**.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

This case was filed on October 28, 2022 by Plaintiffs Arthur Provencher, Michael McGuire, and Ronald Martel on behalf of a class of similarly situated individuals ("Distributors"). Distributors deliver and stock baked goods in grocery stores and other retail establishments on behalf of Bimbo Bakeries USA ("Bimbo") and its corporate affiliate. ECF No. 1 at 1-2. Bimbo is a corporate wholesale bakery. It develops, bakes, and distributes bakery and snack food products to retail customers. *Id.* at 4. The Complaint alleges that Bimbo and its corporate affiliate misclassified Plaintiffs as independent contractors while they were, in fact, employees. *Id.* at 8.

All members of the class are Bimbo distributors that allegedly work more than 40 hours per week and, according to Plaintiffs, should be entitled to overtime pay. The Complaint states that Distributors deliver Bimbo products to retailers within specific timeframes, remove stale or rejected product, and organize products on shelves. *Id.* at 4. Distributors also deploy promotional materials on behalf of Bimbo. Importantly, Distributors allege that Bimbo negotiates with retailers to set nearly all the terms of the distribution transaction, including wholesale and retail prices, service and delivery requirements, shelf space and display requirements, product selection, promotional pricing, control over use and display of promotional

materials, and content of retailers' print advertising. *Id.* at
5-6.

The Complaint also states that Bimbo negotiates terms for
marketing and sale of fresh baked products — which are
distributed by Distributors — at the same time as it negotiates
prices for shelf-stable products, which are not. *Id.* at 5.
According to Distributors, this ties their job duties and
ability to earn income directly to terms set by Bimbo.
Essentially, Distributors argue that they have no discretion
regarding where to distribute products, whether to run
promotions, or how frequently to service stores, meaning that
they cannot "effectively control the profitability of their
work." *Id.* at 6. *See also id.* at 5 ("Bimbo requires Distributors
to strictly follow its directions and to adhere to pricing,
policies, and procedures negotiated between Bimbo and its
retailer-customers.").

The parties' relationships are governed by contracts called
Distribution Agreements ("DAs"). *See, e.g.*, ECF No. 18-2, 18-3,
18-4. The DAs are constructed in the following manner.
Distributors initiate relationships with Bimbo by purchasing
distribution rights for particular geographic areas. This
agreement is formalized into a DA outlining the terms of the
distribution. The DAs provide that Distributors will purchase
"sufficient quantities" of wholesale baked goods from Bimbo to

adequately supply retailers upon resale. *See, e.g.*, ECF No. 18-3 at 5. Product sales from Bimbo to Distributors are generally made on credit: Distributors remit the purchase price into a settlement account on a weekly basis. Distributors then resell the baked goods to retailers at a higher price. Bimbo typically purchases these resale invoices from Distributors[1] and credits Distributors' settlement accounts with the amount of the invoice. According to Distributors, Bimbo then deducts costs for equipment, insurance, lost products, and other regular business expenses from that account. ECF No. 1 at 7. This has the effect of allowing Distributors to receive compensation directly from Bimbo without having to tender payment for the wholesale price each week.

The DAs indicate an intent to create an "independent contractor relationship" under which it is "expressly understood that Distributor has no claim, or right under any circumstances, to any benefits or other compensation currently paid by [Bimbo] to employees, or hereafter declared by [Bimbo] for the benefit of employees." ECF No. 18-3 at 4. The DAs also provide that

---

[1] Bimbo notes that the DAs do not require it to purchase invoices from Distributors. Instead, Distributors can choose to be paid directly in cash by retailers. *See* ECF 19-1 at 11. The DAs provide that Bimbo will purchase the invoices "at the request and for the convenience of Distributor." ECF No. 18-3 at 6. How frequently Bimbo actually purchases the invoices is not addressed by either party's pleading.

Distributors must label their delivery vehicles as operated by
"an Independent Contractor." *Id.* They also allow Distributors to
delegate their contractual obligations to others. *Id.* at 7.
According to the Complaint, Plaintiffs may use whatever vehicles
they choose to deliver Bimbo products — but Bimbo provides (and
dictates) "virtually every other business necessity." ECF No.
19-1 at 7.

The DAs specify that Bimbo is authorized to negotiate business
terms with large chains as an agent of the Distributors. ECF No.
18-3 at 9. Bimbo, in these cases, negotiates with the retail-
customer to set terms and prices of products. However,
Distributors can revoke Bimbo's authority to negotiate on their
behalf with 30 days' notice. *Id.* Whether — and how often — Bimbo
negotiates purchase terms as compared to how often Distributors
negotiate terms remains disputed, but Distributors' complaint
seems to allege that Bimbo sets terms with most (or all) retail
customers. *See* ECF No. 1 at 6.

**B. Procedural Background**

Distributors filed the complaint on October 28, 2022. ECF No.
1. On January 23, 2023, Bimbo filed an answer denying most of
Bimbo's allegations. ECF No. 18. Bimbo's answer included a
counterclaim, arguing that if the Court finds Distributors to be
employees under Vermont labor law, Bimbo should be entitled to
restitution for benefits bestowed upon Distributors by virtue of

their nominal status as independent contractors. ECF No. 18 at 24.

Bimbo also filed a motion for judgment on the pleadings and a motion to strike class claims. ECF No. 17; 19. The motion to strike class claims was denied without prejudice as premature. ECF No. 42. Bimbo's motion for judgment on the pleadings has been fully briefed and is ripe.

After Bimbo filed its counterclaim, the Department of Labor ("DOL") moved to intervene for the limited purpose of opposing the counterclaim. ECF No. 27. The Court granted DOL leave to intervene. ECF No. 41. Distributors filed a motion to dismiss Bimbo's counterclaim for failure to state a claim on March 10, 2023, ECF No. 31, and DOL filed its own motion to dismiss the counterclaim on August 9, 2023. ECF No. 44. Both of those motions are also ripe.

The parties appeared for a consolidated motion hearing on November 13, 2023. The Court took the aforementioned motions (as well as Bimbo's motion for leave to file a sur-reply brief on the counterclaim, ECF No. 38) under advisement. This decision follows.

<u>DISCUSSION</u>

**A. Bimbo's Motion for Judgment on the Pleadings (ECF No. 19)**

**i.   Legal Standard**

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) employs the familiar standard from a motion to dismiss under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). To survive a motion for judgment on the pleadings, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." See *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). The Second Circuit has explained that "the assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief calls for enough to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up). When making this determination, a court draws "all reasonable inferences in the plaintiff's favor." *Lively*, 6 F.4th at 301.

Courts may consider documents attached to the pleadings and documents incorporated by reference when evaluating a motion for judgment on the pleadings under rule 12(c). *Cleveland*, 448 F.3d at 521; *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). Consideration of attached documents does not convert a motion for judgment on the pleadings into a motion for summary judgment. *Id.* Accordingly, the Court may consider the content and terms of the DAs when evaluating Bimbo's Motion for Judgment on the Pleadings.

**ii.  Analysis**

Bimbo seeks judgment on the pleadings for dismissal of
Count III of Distributors' complaint under the Vermont
Employment Practices Act, 21 V.S.A. § 384(c).[2] The Vermont
Employment Practices Act governs the payment of wages to
employees and defines "wages" as "all renumeration payable for
services rendered by an employee, including salary, commissions,
and incentive pay." 21 V.S.A. § 341(5). Bimbo submits that to
succeed on their claim for improper wage deductions under
Vermont law, Distributors must prove (1) that they were actually
employees and (2) that they were paid wages for services
rendered.

While Bimbo asserts that Distributors were neither
"employees" nor paid "wages," its motion focuses entirely on the
wages question.[3] It submits that the Distribution Agreements
allow Plaintiffs to delegate the services required by the
contract and that, therefore, payments to Plaintiffs are not
tied to "services rendered." ECF No. 19-1 at 10 ("BFBD and its
predecessors did not require Plaintiffs to perform *any* services
at all, as they were free to delegate any or all of their

---

[2] Bimbo's motion does not contest liability under the FLSA. *See
generally* ECF No. 19.
[3] Bimbo does not concede that Plaintiffs were employees but
chooses not to litigate that definition at this stage of the
proceedings.

obligations under the Distribution Agreements as they saw
fit."). Bimbo also argues that because payments made to
distributors came from revenue generated from sales to
customers, they should not be considered wages for services
rendered. *Id.* Bimbo adds that the Distribution Agreements
expressly disclaim Plaintiffs' status as employees, *id.* at 4,
and states that Plaintiffs "have no claim, or right under any
circumstances, to any benefits or other compensation currently
paid by Bimbo to employees."  ECF No. 19-1 at 8.

The parties agree that the operative definition of wage is
"renumeration payable for services rendered." 21 V.S.A. §
341(5). Therefore, the question is what it means for a payment
to be "rendered" for a "service."

The Vermont Supreme Court most recently addressed the
definition of "wages" in *Tanzer v. MyWebGrocer*, *Inc.*, 203 A.3d
1186 (Vt. 2018). That case dealt with whether phantom shares, "a
right to the appreciation in the corporation's stock," should be
considered wages under the Vermont Employment Practices Act. *Id.*
at 1203. The court began by noting that wage statutes, as
remedial statutes, "must be liberally construed," and explained
that the statutory definition of wages is broad – although not
without parameters. *Id.* at 1203. Because the court had
previously considered wages as synonymous with "earnings," *id.*,
it counseled that evaluation of whether phantom shares qualified

as a wage required consideration of two factors that other
courts had analyzed in prior cases.[4] Those factors are "(1)
whether the compensation at issue is awarded because of the
employee's service, or because of the growth and financial
success of the employer, and (2) whether the employer has
discretion regarding whether to award the compensation." *Id.*
(citing *Weems v. Citigroup, Inc.*, 961 A.2d 349, 357 (Conn.
2008)). The court cited several other state supreme court cases
to buttress its analysis, and noted that discretionary bonuses
and incentive payments conditioned on future performance do not
fall under the statutory definition of "wages." *Id.* at 1204
(citing *Truelove v. Ne. Capital & Advisory, Inc.*, 738 N.E.2d
770, 771 (N.Y. 2000); *Coen v. SemGroup Energy Partners G.P.,
LLC*, 2013 OK. Civ. App. 75, ¶ 21).

Drawing all reasonable inferences in favor of Distributors,
*Lively*, 6 F.4th at 301, both factors plausibly support
Distributors' claim that they were paid wages. First, the

---

[4] Bimbo submits that "the statutory definition of 'wages' does
not encompass mere 'earnings'" and that "any so-called
relationship between the terms 'wages' and 'earnings' does not
do away with the basic statutory requirement that all 'wages'
must be tied to 'services rendered.'" ECF No. 32 at 11. This may
be true, but the *Tanzer* Court's comparison of "earnings" to
"wages" shows that the same factors merit consideration in
evaluation of both phrases. *See Tanzer*, 203 A.3d at 1202-03 ("In
other contexts, we have defined wages as earnings. . . . We
relied on this definition of wages [as equivalent to earnings]
in *Stowell*, and it guides our analysis in this case.")
(citations omitted).

compensation at issue is awarded because of Distributors'
service, not because of the financial growth of the company. The
fact that Distributors' payment was contingent on discretionary
performance does not necessarily take it beyond the definition
of wages. Wages are conditioned on the rendering of services;
"the way in which wages may become due is beside the point."
*Tanzer*, 203 A.3d at 1204. Bimbo needs a method of ensuring that
its products are placed with retailers so that the products can
ultimately reach consumers. Distributors provide that service,
and are compensated for it. While they are not salaried, they
plausibly provide delivery services for Bimbo in exchange for
value.

The second *Tanzer* factor is "whether the employer has
discretion regarding whether to award the compensation." *Tanzer*,
203 A.3d at 1023. The *Tanzer* court explained that discretionary
payments are generally not considered wages because those
payments look more like bonuses than compensation for services
rendered. *Id.* Bimbo's discretion regarding Distributors'
compensation remains an open question of fact. Bimbo argues that
pursuant to the payment structure of the DAs, all of
Distributors' compensation comes from retailers. It states that
it only pays Distributors to streamline the payment system. ECF
No. 19-1 at 8 (stating that Bimbo purchases invoices "for the
convenience of [Distributors]"). However, it appears at least

11

plausible that Bimbo could be contractually obligated to provide payment to Distributors. Distributors have the right to receive cash payment directly from retailers, but the DAs provide that Bimbo will, "at the *request* of" the Distributors, purchase the retailers' invoices from Distributors and pay Distributors from the settlement account. ECF No. 18-3 at 6 (emphasis added). This language suggests that upon claim by Distributors ("request"), Bimbo's contractual obligation kicks into effect, indicating that Bimbo cannot choose whether to pay distributors.

Additionally, Bimbo (allegedly) takes deductions from the settlement accounts before paying Distributors. ECF No. 1 at 7. This practice indicates that Bimbo's purchase of invoices and subsequent payment to Distributors *must* occur if Distributors are to receive the correct amount that they are due after Bimbo has deducted its fees. If Bimbo did not deduct from the settlement accounts, it would likely argue that Distributors were overpaid. This non-discretionary payment structure plausibly situates Bimbo as a payer of wages rather than as a conduit for compensation from retailers.

Because *Tanzer* dealt with equity interests rather than cash payments, its analytical framework is, in some ways, an inexact fit for the facts of this case. But since the Vermont employment statute was amended in 2013 to include the current definition of "wages," 21 V.S.A. § 341(5), Vermont courts have had few

12

opportunities to interpret the language. Accordingly, the *Tanzer* framework is the closest precedential analogue. Nonetheless, the conclusion that comes from evaluation of the *Tanzer* factors is underscored by a commonsense reading of the statute along with the Vermont Supreme Court's guidance that wage statutes "must be liberally construed." *Stowell v. Action Moving & Storage, Inc.*, 182 Vt. 98, 102 (2007). Whether a payment is made as "renumeration" for "services rendered" seems to turn on whether the services are rendered *to* the employer or to the performing agent itself, as its own business entity.  In other words, were Distributors' services provided at the behest of Bimbo or as a result of their own business judgment?

There are unresolved issues relating to this question, but accepting Distributors' allegations "as true," the facts pled plausibly support the conclusion that Distributors were paid wages. *Lively,* 6 F.4th at 301. Specifically, it is not clear whether Distributors' "services" are provided voluntarily – and under their own terms – or under conditions rigidly imposed and controlled by Bimbo. In the hearing on this motion, counsel for Bimbo stated that the "purpose of the distribution agreement" is for Distributors to "run their own businesses" via negotiation of retail arrangements. ECF No. 57 at 17. But the facts alleged in the complaint plausibly support the notion that Bimbo controls the relationship between Distributors and retailers,

*see* ECF No. 1 at 4-7, an inference underscored by
representations made in the hearing. The parties agree that
Bimbo sets retail prices in some circumstances. *See* ECF No. 57
at 12 ("[The Court]: Who sets the price? [Defendants' Counsel]:
It depends. Typically it is the company with respect to most
stores."). They also agree that Bimbo negotiates shelf space
arrangements with some retailers and sets the terms of product
promotions. *Id.* at 13, 16; *see also id.* at 24 (Plaintiff's
counsel stating that "Bimbo worked directly with major chain
retailers to establish all of the major terms of the
relationship, including, pricing, including shelf space,
including presentation."). For the purposes of the motion for
judgment on the pleadings, Distributors have pled adequate facts
that, accepted as true, plausibly lead to the conclusion that
Distributors' services were rendered *to* Bimbo at Bimbo's
direction and under Bimbo's terms, making their compensation
"renumeration payable for services rendered" under 21 V.S.A. §
341.

   The DAs allow Distributors to delegate their contractual
responsibilities. But Distributors' ability to assign their DA
obligations does not necessarily remove Bimbo's payments from
the purview of compensation for "services rendered."
Distributors' ability to delegate a task indicates solely that
*they* are not required to perform the task themselves, not that

the payments for the task are not in return for a service rendered.[5] Nothing in *Tanzer* – or other Vermont law – indicates that a personal contractual obligation is required for payments to be considered wages. *Cf. Tanzer*, 203 A.3d at 1204 ("The way in which wages may become due is beside the point."). The statutory focus is on whether the payments themselves are for a service rendered – not on who performed the service.

Bimbo asserts that the Second Circuit's holding in *Mujo v. Jani-King Intl., Inc.*, 13 F.4th 204 (2d Cir. 2021), warrants dismissal of Distributors' state law claim. ECF No. 19-1 at 14. *Mujo* involved a commercial cleaning company, Jani-King, that operated via a franchise model. Jani-King, the parent company, marketed its cleaning services and negotiated terms directly with customers. It then referred customers to the franchises, which were free to decline the opportunities. *Mujo*, 13 F.4th at 207. Customers then paid Jani-King directly, and Jani-King would deduct "certain fees" and remit the rest of the payment to the franchise. The franchises brought a class action lawsuit for unpaid wages under the Connecticut Minimum Wage Act. *Id.* at 208.

---

[5] Because the Court finds that the payments made to Distributors could plausibly be considered payments for services rendered, it need not address Distributors' characterization of the payments as commissions (undoubtedly wages under Vermont law). *See* ECF No. 30 at 7; *Stowell v. Action Moving & Storage, Inc.*, 933 A.2d 1128. 1133 (Vt. 2007); 21 V.S.A. § 341(5).

The case presented several related questions under Connecticut law. The first was whether the franchises were "employees," and the second was – if the franchises were considered employees – whether Jani-King unlawfully withheld wages. *Id.* at 209. The relevant Connecticut statute, Conn. Gen. Stat. § 31-71(a)(3), defined wages as "compensation for labor or services rendered by an employee." *Id.*

The Second Circuit held that the gross revenue paid from customers directly to Jani-King did not qualify as a "wage" under the Connecticut statute, but that the profits returned to the franchises could be considered "wages." *Id.* at 211-13. First, it noted that the Jani-King franchise agreement "expressly provide[d] for the deductions challenged by [the franchises]." *Id.* at 211. Accordingly, it concluded that even if the franchises were employees, their wages were the funds remaining "after Jani-King deducts its fees under the franchise agreement." *Id.* It also noted that Connecticut law does not "prohibit employment agreements that excluded from wages certain revenue attributable to the employee's efforts," but instead provides a remedy for unauthorized deductions from wages owed according to contractual agreements. *Id.* at 212. Therefore, *Mujo* stands for the principle that – under Connecticut law – gross revenue paid by customers to an intermediary does not constitute

wages, but the subsequent remission to the entities that performed the services *can* constitute wages.

This holding cuts in favor of Distributors. The Second Circuit acknowledged that the profits paid to franchises could be considered wages, but held that Jani-King could withhold certain amounts from those payments based upon express terms of the franchise contracts. Unlike *Mujo*, this case is in large part[6] about whether Bimbo paid Distributors wages at all, which would mandate payment of overtime under the Vermont wage statute.[7] *Mujo* seems to answer that question in the affirmative.

But *Mujo* does not conclusively resolve whether Distributors were paid wages. First, the Second Circuit did not *hold* that the ultimate payments to the franchises were wages – just that *if* the franchises were paid wages, their wages were the post-deduction payments, meaning that the deductions from the incoming revenues were lawful. *See id.* ("Even assuming that the

---

[6] Distributors also claim that Bimbo unlawfully deducted from their wages. *See* ECF No. 1 at 7, 14. *Mujo* makes clear that contractually authorized deductions do not violate Connecticut law. It is not yet clear whether the alleged deductions in this case were contractually authorized, and the only issue now before the Court is whether the ultimate payments *back to* Distributors could plausibly be considered wages. Because *Mujo* acknowledges that they could, because the DAs are silent on deductions from the invoices purchased by Bimbo, and because this case does not arise under Connecticut law, *Mujo* does not warrant dismissal.

[7] There are, of course, other factors determining whether Distributors are owed overtime, but none are at disputed at this phase of litigation.

Appellants are employees who receive wages subject to the Connecticut Minimum Wage Act, their wages under the franchise agreement are the funds that remain after Jani-King deducts its fees under the franchise agreement."). And further, the case was based on Connecticut law, not Vermont law, limiting its applicability here.

Two comparable cases from other district courts warrant discussion. One is *Troche v. Bimbo Foods Bakeries Distribution, Inc.*, in which a North Carolina district court held that similar Bimbo distributors were not entitled to overtime under a North Carolina wage statute. 11-cv-234, 2015 WL 4920280 at *1 (W.D.N.C. Aug. 31, 2015). While that court ultimately concluded that the distributors' compensation was not a "wage" under the North Carolina statute, *id.* at *7, it also noted that a reasonable jury could have found that Bimbo exercised substantial control over pricing and promotions. *Id.* at *4-*5. This is relevant because if Bimbo controls both the rate at which it sells goods to the distributors *and* the rate at which the distributors resell goods to retailers, the distributors themselves provide a simple service to Bimbo: delivery of goods (and are compensated for that service). Bimbo's remittance of the resale price of the goods would then seems to be a wage set by Bimbo, instead of a profit derived by the distributors from independent business acumen.

18

The other related case is *Mode v. S-L Distribution Co.,*
*LLC*, 18-cv-150, 2019 WL 1057045 (W.D.N.C. Mar. 6, 2019). That
case dealt with similar distributors, labeled by their employer
as independent contractors. The district court and the
magistrate judge agreed that the plaintiff-distributors' income
did not meet North Carolina's definition of wages. *Id.* at *3.
Both concluded that, pursuant to *Troche*, profit made from
purchasing a good and reselling it at a higher price went
categorically beyond the statutory definition of wages. *Id.*
However, again, that court's holding turned on the fact that the
distributors' "compensation was solely based on volume of goods
[ ] purchased from [the wholesaler] and then resold to third
parties at a higher price." *Id.* at 4. This implies that the
operative feature taking this agreement beyond the definition of
"wages" was the distributors' discretion to *control* the profit
that they made – either by setting prices or controlling
quantities sold.

As discussed above, Distributors' control in this case
remains unclear. There are questions of fact as to how much
flexibility Distributors have over their earning abilities.
Specifically, it is not clear whether Bimbo or Distributors set
prices and quantities, and whether Bimbo purchases invoices from
Distributors as a courtesy or as a contractual obligation. If
Distributors sell products subject to Bimbo's discretion as to

prices and amounts, then Distributors function as intermediaries – in other words, employees rendering a service (product delivery) in return for a wage. Similarly, if Bimbo purchases invoices as a matter of contractual obligation and subsequently remits earned profits to Distributors, Bimbo is situated as an employer: it compensates Distributors for their services with wages. The inverse might also be true – but further factual development is necessary to resolve these questions. Accordingly, Bimbo's motion for judgment on the pleadings is **denied.**

**B. The Counterclaim (ECF 18) and Motions to Dismiss the Counterclaim (ECF Nos. 31, 44)**

As part of its answer, Bimbo filed a counterclaim against Distributors. ECF No. 18 at 24. It argues that Distributors are properly classified as independent contractors — but that if they are considered employees, they should have to pay Bimbo back for benefits that they received by virtue of their designation as independent contractors. According to Bimbo, these benefits include (1) the revenue that Distributors received for distributing Bimbo's products, *id.* at 26; (2) payments made to Distributors as consideration for advertising Bimbo's products, *id.* at 29; and (3) profits that Distributors

made by selling geographic distribution rights. *Id.* Both
Distributors and DOL have filed motions to dismiss Bimbo's
counterclaim. ECF Nos. 31, 44. Because the Court concludes that
Bimbo's counterclaim is preempted by the FLSA, it grants those
motions.

### i.  Legal Standard

A motion to dismiss a counterclaim for failure to state a
claim "is evaluated under the same standard as a motion to
dismiss a complaint." *Radiancy, Inc. v. Viatek Consumer Prods.
Grp. Inc.*, 138 F. Supp. 3d 303, 313 (S.D.N.Y. 2014). Therefore,
the counterclaim must "contain sufficient factual matter,
accepted as true, to 'state a claim for relief that is plausible
on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
Just like when evaluating a complaint, when evaluating a
counterclaim the Court must "tak[e] its factual allegations to
be true and draw[] all reasonable inferences in . . . favor" of
the non-moving party. *Syeed v. Bloomberg L.P.*, 58 F.4th 64, 67
(2d Cir. 2023).

### ii.  Discussion

Distributors and DOL argue that the counterclaim should be
dismissed because allowing counterclaims contingent upon FLSA
liability would chill FLSA enforcement. *See* ECF No. 31-1 at 9-
14; ECF No. 44-1 at 12-13. Distributors argue that allowing

21

Bimbo's counterclaim would allow employers to "use the ongoing threat of counterclaims to discourage [workers] from asserting the FLSA rights." ECF No. 31-1 at 9. The Department of Labor relatedly asserts that its ability to enforce the FLSA via injunctions will be impeded by such counterclaims because it depends upon employee willingness to speak freely with DOL representatives to adequately enforce the statute. ECF No. 44-1 at 12-14. Both parties' arguments boil down to assertions that FLSA policy would be frustrated by allowing the counterclaim to proceed.

### 1. The Second Circuit's Decision in *Herman*

The most relevant precedent in this area is *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999). In *Herman*, the Second Circuit concluded that the chief officer of a security firm could be held liable as an employer under the FLSA. *Id.* at 140. That officer then claimed indemnification and contribution from other officers under the FLSA. *Id.* at 143. The Second Circuit concluded that the FLSA does not authorize such relief, explaining that "the FLSA has a comprehensive remedial scheme as shown by the 'express provision for private enforcement in carefully defined circumstances'" and explaining that such a comprehensive remedial scheme "strongly counsels against judicially engrafting additional remedies." *Id.* at 144 (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S.

77, 93 (1981)). In other words, the FLSA does not countenance additional remedies for liable parties beyond the scope of the statute.

The employer then argued that he ought to be able to claim indemnification or contribution against his co-employer under New York law even if the FLSA did not provide him with such a right of action.[8] *See Herman*, 172 F.3d at 144. The Second Circuit quickly dismissed this argument, stating that "the FLSA's remedial scheme is sufficiently comprehensive as to preempt state law in this respect." *Id.* This guidance indicates that certain state law claims which seek repayment for liability are preempted under the FLSA, but does not thoroughly illuminate the parameters of such preempted state law – leaving that task to courts such as this one.

Bimbo's claim is for unjust enrichment, not contribution or indemnification like the claim in *Herman*. Bimbo sees this as dispositive and argues that *Herman* is inapplicable because unjust enrichment is categorically different from contribution or indemnification. *See* ECF No. 47 at 14-16 (arguing that the counterclaim "bears no likeness to and is not 'functionally' an

---

[8] Bimbo argues that *Herman* is inapplicable because it involved the availability of a private right to contribution/indemnification under the FLSA — not under state law (as Bimbo argues in this case). *See* ECF No. 47 at 13; *Herman*, 172 F.3d at 144. But *Herman* also addressed the employer's state law arguments. *Id.*

indemnification or contribution claim"); ECF No. 57 at 57. Bimbo states that its counterclaim simply seeks to "offset from any damages award monies plaintiffs received as a result of their independent contractor status." *Id.*

To determine whether Bimbo's counterclaim falls within the scope of *Herman*, it is useful to first compare the elements of Vermont contribution, indemnification, and unjust enrichment claims. As a threshold matter, Vermont law does not recognize a right to contribution. *See Haupt v. Triggs*, 2022 VT 61, ¶ 6 (explaining that the Vermont Supreme Court has "repeatedly reaffirmed" the rule of no-contribution). The Vermont Supreme Court has explained that equitable or implied indemnity "will be imputed only when equitable considerations concerning the nature of the parties' obligations to one another . . . demonstrate that it is fair to shift the entire loss occasioned by the injury from one party to another." *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 29 (1999). In other words, "a party seeking implied equitable indemnity may only recover where its potential liability is vicariously derivative of the acts of the indemnitor and it is not independently culpable." *Herco v. Foster Motors*, 2015 VT 3, ¶ 10. This "axiomatic" principle of indemnity actions makes it clear that indemnification serves as an equitable transfer of liability in cases where fault properly lies with a third party.

24

An unjust enrichment action under Vermont law requires satisfaction of three elements. First, a benefit must have been conferred on the defendant; second, the defendant must have accepted the benefit; and third, the defendant retained the benefit under such circumstances that it would be inequitable for the defendant not to compensate plaintiff for its value. *McLaren v. Gabel*, 2020 VT 8, ¶ 25. The third prong of an unjust enrichment action requires a plaintiff to prove that "equity and good conscience" require return of the value bestowed. *Mueller v. Mueller*, 2012 VT 59, ¶ 28. Just like an indemnity action, this requires a court to find that it would be inequitable for one party to walk away from liability.

This particular unjust enrichment counterclaim is especially analogous to an indemnification or contribution claim. Bimbo requests that it be paid "the value of earnings associated with . . . [Distributors]' independent-contractor status in order to offset, reduce, or nullify any award of wages and/or damages, liquidated damages, and any other liabilities" that Distributors might be owed. ECF No. 18 at 34. Nullifying and offsetting liability sounds of indemnification and contribution, because both require one party to absorb loss by another.

Bimbo's reason why the counterclaim is distinct seems to be that contribution and indemnification claims seek repayment

25

based upon *fault* of the defendant-party, while unjust enrichment
claims simply seek "the return of benefits" bestowed. ECF No. 34
at 22 (quoting *Ruffin v. Entm't of the E. Panhandle*, 845 F.
Supp. 2d 762, 766 (N.D. W. Va. 2011)). But Bimbo's counterclaim
amounts to an assertion that if Bimbo acted unlawfully,
Distributors should have to relinquish contractual benefits to
reduce Bimbo's financial liability. While Bimbo's claim does not
seek payment from Distributors because of *their* alleged
complicity in the unlawful conduct – as in a classic
contribution or equitable indemnification claim – it still
conditions payment to the liable employer on a finding of fault,
just of the party *seeking repayment* rather than the party from
whom repayment is sought. In plain language: in an
indemnification claim, the plaintiff says "you are at fault, so
you should have to pay me back." In *this* unjust enrichment
claim, Bimbo says "I am at fault because I misclassified
Distributors, so I should be paid back what Distributors
received because of my unlawful action."

The formal differences between the contribution and
indemnification claims at issue in *Herman* and the instant unjust
enrichment claim do not entitle this claim to different
treatment than the ones in *Herman*.[9] In that case, the Second

---

[9] Several other courts have considered actions other than
indemnity or contribution actions as functionally identical.

Circuit noted that the FLSA "was designed to regulate the
conduct of employers for the benefit of employees" in support of
its conclusion that employers were not entitled to rights beyond
those explicitly delineated in the statute. *Herman*, 172 F.3d at
144. Treating this unjust enrichment counterclaim differently
would make a non-liable employee (and the precise group
protected by the statute) *more* vulnerable to a counterclaim than
jointly liable co-employers in *Herman*. *Cf. Barrentine v.
Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739 (1981)
("The principle congressional purpose in enacting [the FLSA] was
to protect all covered workers from substandard wages and
oppressive working hours."). Such a counterintuitive result is
not countenanced by the FLSA.

### 2. Preemption

Bimbo's unjust enrichment counterclaim is governed by
*Herman*. However, the question remains: does the Second Circuit's

---

*See, e.g.*, *Lyle v. Food Lion*, 954 F.2d 984, 987 (4th Cir. 1992)
(rejecting employer's claim that a lead employee violated a
fiduciary duty and explaining that "in effect, Food Lion sought
to indemnify itself against Tew for its own violation of the
FLSA, which the district court found, and we agree, is something
the FLSA simply will not allow."); *Flores v. Mamma Lombardis of
Holbrook, Inc.*, 942 F. Supp. 2d 274, 278 (E.D.N.Y. 2013)
(rejecting claims for contributory negligence and joint employer
liability and explaining that "[w]hatever language Defendants
choose to employ, and whatever their supposed theory, it is
clear that they seek contribution from employees for any damages
. . . such claims are barred as contrary to the statutory intent
of both the FLSA and the New York Labor Law.").

instruction that "the FLSA's remedial scheme is sufficiently comprehensive as to preempt state law in this respect" mean that Bimbo's claim for unjust enrichment conditioned upon a finding of statutory liability is preempted by the FLSA? The Court finds that it is.

Article IV of the United States Constitution provides that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land." The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County, Fla. V. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)). State action may be foreclosed by "express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, (2001). A state law may conflict with a congressional enactment when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Express and field preemption do not apply here. Nothing in the FLSA prohibits states from legislating in the field of labor relations. In fact, the FLSA expressly provides that "[n]o

provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter." 29 U.S.C. § 218(a). This provision – called the "Savings Clause" – has been interpreted to provide that states may impose additional requirements on employers, and that whatever standard is more worker-protective will generally control. As the Second Circuit has explained, "Congress' intent to allow state regulation to coexist with the federal scheme can be found in [the Savings Clause]." *Overnite Transportation Co. v. Tianti*, 926 F.2d 220, 222 (2d Cir. 1991).

Because express and field preemption do not apply, Bimbo's counterclaim can only be preempted if the Court finds that such a counterclaim would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Hines*, 312 U.S. at 67). The Second Circuit has explained that "[p]reemption analysis rests on two fundamental principles." *New York Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017). First, as in any preemption case, the Court must "start with the assumption that the historic police powers of the States were not to be superseded . . .

unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This is especially true when Congress legislates in an area that is "traditionally the domain of state law." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013). To overcome this presumption, the party seeking preemption must show that the conflict between the federal and state laws "is so direct and positive that the two . . . cannot be reconciled or consistently stand together." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013).

Second, "since preemption is ultimately a question of statutory construction," *New York Pet Welfare Ass'n*, 850 F.3d at 87, congressional intent is "the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Determining congressional intent behind a federal act is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). One consideration informing this judgment is the "well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies.'" *Hinck v. United States*, 550 U.S. 501, 506 (2007) (quoting *EC Term of Years Trust v. United States*, 550 U.S. 429, 433 (2007)).

Labor relations is a field traditionally regulated by the states. The Supreme Court has explained that "pre-emption should not be lightly inferred in [the area of substantive labor standards], since the establishment of labor standards falls within the traditional police power of the state." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987). As explained above, the express terms of the FLSA echo this conclusion. The Savings Clause makes it clear that employers must comply with any "[s]tate law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter." 29 U.S.C. § 218(a).

But the Savings Clause only cuts one way. It reveals a clear congressional intent to allow states to raise baseline worker protections above the level established by the federal government. *Overnite Transp. Co. v. Tianti*, 926 F.2d 220, 222 (2d Cir. 1991). It also reflects congressional unwillingness to allow states to reduce worker protections. While the FLSA clearly does not preempt the field of labor regulation, it does preempt state laws that contravene its central purpose: to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and to ensure that employees

are fairly compensated. 29 U.S.C. § 202(a); *see also Reich v. New York City Transit Auth.*, 45 F.3d 646 (2d Cir. 1995).

The FLSA's remedial scheme and accompanying regulations are sufficiently detailed to evince a Congressional intent to preempt common law remedies stemming from the same violation when those remedies are sought to reduce FLSA liability. Courts evaluating the preemptive scope of the FLSA have noted that the statute has an "unusually elaborate enforcement scheme" which "provides for a careful blend of administrative and judicial enforcement powers." *DeSilva v. North Shore-Long Island Jewish Health Sys. Inc.*, 770 F. Supp. 2d 497, 513 (E.D.N.Y. 2011) (quoting *Brown v. General Services Administration*, 425 U.S. 820, 833 (1976)); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007)). Those cases have noted the litany of legal and equitable remedies available to private plaintiffs, *id.*, as well as the unique remedies available to the Secretary of Labor – including the right to limit private action upon filing of a complaint by the Secretary. *Id.*; 29 U.S.C. § 216(b).

Most relevant to this case is the fact that the FLSA contains a thorough remedies section detailing the offsets available to liable employers. The FLSA explicitly permits employers to offset or "credit" toward unpaid overtime certain categories of extra "premium rate" compensation. 29 U.S.C. §§ 207(e)(5)–(7), (h)(2); *see also* 29 C.F.R. § 778.202(c)

(explaining how premium payments may be credited). In fact, 29 C.F.R. § 778.201(c) explicitly states that "[n]o other types of renumeration for employment [other than the three types of extra premium payments outlined in 29 U.S.C. §§ 207(e)(5)-(7)] may be so credited" as to reduce owed overtime compensation. Additionally, most courts interpreting this provision have held that "FLSA credit may be applied to offset overtime liability only within the work period in which it accrued." *Conzo v. City of N.Y.*, 667 F. Supp. 2d 279, 291 (S.D.N.Y. 2009). The FLSA, and accompanying regulations, outline a thorough and comprehensive remedial scheme allowing certain advance payments to offset liability for unpaid overtime, and disallowing others. The statute's explicit delineation of a limited category of available offsets strongly evinces a congressional intent to preclude additional offsets or remedies.

This Court is hardly the first to conclude that state causes of action in the field of overtime and wage regulation may be preempted.[10] While "the FLSA does not preempt state

---

[10] Several courts – in this Circuit and others – have found common law claims predicated on FLSA violations to be preempted under the framework articulated in this paragraph. *See, e.g.*, *Sosnowy v. A. Perri Farms, Inc.*, 764 F. Supp. 2d 457, 464-65 ("[A]llowing additional remedies for duplicative claims would serve as an obstacle to the enforcement of the FLSA."); *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007) ("Congress prescribed exclusive remedies in the FLSA for violations of its mandates. . . . Class Members' FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle

regulation of overtime wages . . . that provide an additional,
and even sometimes duplicative, source of substantive rights,"
state common law claims can still be preempted. *Sosnowy v. A.
Perri Farms, Inc.*, 764 F. Supp. 2d 457, 464-65 (E.D.N.Y. 2011);
*see also Contrera v. Langer*, 314 F. Supp. 3d 562, 571 (S.D.N.Y.
2018) (explaining that "[t]he Second Circuit has not squarely
addressed whether common law claims for overtime are preempted
by the FLSA"). Courts have explained that the basis of this
distinction is that state overtime wage laws "confer a
substantive right for overtime compensation separate from the
FLSA," while "state common law claims that are premised on
violations of the FLSA simply provide a different remedy for

---

preemption.") (citations omitted); *Wood v. TriVita, Inc.*, No.
08-CV-765, 2008 WL 6566637, at *4 (D. Ariz. Sept. 18, 2008);
*Griffin v. Aldi*, 16-cv-354, 2016 WL 7235787 (N.D.N.Y 2016)
("[T]he question is whether in the absence of an FLSA claim, the
plaintiff would have a viable state common law claim."); *Pridgen
v. Appen Butler Hill, Inc.*, No. CV-JKB-18-61, 2018 WL 1912213,
at *2 (D. Md. Apr. 23, 2018) ("This claim — that Plaintiff is
owed overtime under the FLSA because he was improperly
classified — is an FLSA claim, regardless of what label one
attaches to it. Such a claim must be brought under the FLSA's
enforcement scheme, and would preempt any state common law claim
based on the same FLSA violation."); *Dreves v. Hudson Grp. (HG)
Retail, LLC*, No. 2:11-CV-00004, 2012 WL 668774, at *4 (D. Vt.
Feb. 29, 2012) ("[I]f Plaintiffs were seeking any relief not
provided for by the FLSA, common-law claims for such relief
likely would not be preempted."); *Fracasse v. People's United
Bank*, No. 3:12-CV-856, 2012 WL 12848192, at *3 (D. Conn. Dec.
26, 2012), *vacated and remanded on other grounds*, 747 F.3d 141
(2d Cir. 2014) "[A]dditional remedies for the failure to pay
overtime compensation, other than those the FLSA has prescribed,
frustrate the objectives of the FLSA to provide a comprehensive
remedial scheme.").

FLSA violations." *Id.* at 465. The distinction is the *source* of the right: if the claim is based upon a statute that confers a substantive right, then the remedy sought is not in tension with the FLSA's remedial scheme. On the other hand, if the common law claim stems from a finding of FLSA liability, it disrupts the carefully tailored congressional framework and violates the Supremacy Clause.

Further, appellate courts in other circuits have explained that allowing counterclaims against alleged FLSA violations can be counterproductive for the statute's enforcement. *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 741 (5th Cir. 2010). ("Generally speaking, courts have been hesitant to permit an employer to file counterclaims in FLSA suits for money the employer claims the employee owes it."); *Gagnon v. United TechniSource, Inc.*, 607 F.3d 1036, 1042 (5th Cir. 2010) (employer counterclaims "should not be addressed in a FLSA action"); *Donovan v. Pointon*, 717 F.2d 1320, 1323 (10th Cir. 1983) ("[T]he purpose of the present action is to bring Pointon into compliance with the Act by enforcing a public right. To permit him in such a proceeding to try his private claims, real or imagined, against his employees would delay and even subvert the whole process."). This is especially true here, where some of the money that Bimbo seeks to reclaim via unjust enrichment is the very payment that Distributors allege were wages. *Compare*

ECF No. 1 (alleging that the revenue from products sold to retailers was a wage) *with* ECF No. 18 at 32 (claiming that Distributors were unjustly enriched by receiving this money). This amounts to a claim that in an FLSA misclassification action, an employer may counterclaim for *any* wages paid to their employees under a theory of unjust enrichment. To be sure, some of those wages may ultimately be credited against a damages award – but such credit should be governed by the FLSA's detailed offsets scheme, not by state common law.

Distributors and DOL also argue that allowing such counterclaims will impede enforcement of the statute. *See* ECF No. 31-1 at 11; 44-1 at 12. Based upon the logic articulated above, it seems likely that employees would hesitate before bringing FLSA claims if they knew that any benefit conferred under an employment contract could be clawed back pursuant to an unjust enrichment counterclaim.[11] They may also hesitate to speak

---

[11] Bimbo's argument that it only conferred benefits upon Distributors by virtue of their status as independent contractors proves too much. This logic justifies future employers accused of misclassification arguing that if they had known that their workers were employees, they would have paid minimum wage – and then seeking repayment of any value in excess of that minimum wage, even when the original employment contract provided for substantially greater compensation. This would serve as a substantial deterrent to private lawsuits under the FLSA. *See, e.g., Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1408 (10th Cir. 1992) ("Compliance with the FLSA will not be furthered if employees must defend against indemnity actions. Such actions are not part of the comprehensive statutory scheme set forth by Congress.").

with DOL representatives seeking to enforce the statute via
prospective injunctive relief if employers might later argue
that they were entitled to repayment for benefits bestowed under
nominal independent contractor status. Additionally, "an
employer who believed that any violation of the overtime or
minimum wage provisions could be recovered from its employees
would have a diminished incentive to comply with the statute,"
potentially further impeding the FLSA's effectiveness. *LeCompte
v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986).[12]

Finally, Bimbo argues that its counterclaim should be
allowed to proceed past the motion to dismiss phase because the
state law claim may lie if Bimbo is found liable for a violation
of the Vermont Labor Law and not of the FLSA. First, under
Article IV, state laws that are inconsistent with federal
statutes are invalid – and for the reasons outlined above,

---

[12] Bimbo responds that disallowing such state law counterclaims
would provide a "windfall" to Distributors, contrary to the
FLSA's purpose. ECF No. 47 at 20 (citing 29 U.S.C. § 251(a)).
The FLSA's more specific provisions governing offsets are meant
to avoid such windfalls; that is why the statute allows for
offsets in the first place. Bimbo also argues that counterclaims
like this one have been brought in the past, and that subsequent
misclassification lawsuits disprove any enforcement chilling
effect. ECF No. 47 at 21. There is no way of knowing whether
these counterclaims dissuaded other meritorious lawsuits. The
mere fact that some litigants choose to proceed despite the
threat of a counterclaim does not prove the absence of a
deterrent effect.

Vermont common law unjust enrichment claims in cases involving
unpaid overtime are invalid under the FLSA.

Second, Bimbo's counterclaim is independently disallowed
under state law because it runs contrary to the remedial scheme
of the Vermont wage law. Several courts have found that *Herman*'s
logic applies to state wage statutory schemes as well. *See,
e.g.*, *Flores*, 942 F. Supp. 2d at 278 ("While *Herman* decides the
contribution/indemnification issue in the context of a federal
FLSA claim, this court joins others within this circuit and
holds that the same reasoning bars such claims under the New
York Labor Law."); *McGlone v. Cont. Callers, Inc.*, 49 F. Supp.
3d 364, 373 n.3 (S.D.N.Y. 2014) (same). This Court agrees that
this conclusion applies to the Vermont Employment Practices Act
as well. The Vermont Supreme Court recently evaluated a claim
that an employer violated the FLSA and Vermont's wage and hours
law and explained that because Vermont's law is "substantially
like the FLSA, our conclusion today applies equally to [the
Vermont law]." *Mitchell v. NBT Bank, N.A.*, 278 A.3d 1015, 1018
n.2 (Vt. 2022); *see also Havey v. Homebound Mortgage, Inc.*, 547
F.3d 158, 160 n.3 (2d Cir. 2008) (noting that the litigants
agreed that the court's determination of the FLSA question would
also "govern the question under Vermont law."). And the Vermont
Employment Practices Act has a similar worker-protective purpose
to the FLSA. *See* 21 V.S.A. § 381 ("[W]orkers employed in any

occupation should receive wages sufficient to provide adequate
maintenance and to protect their health."). It also mandates
that employers pay employees at least one and one-half times the
regular wage rate" for each hour worked above 40 in any given
week, 21 V.S.A. § 384(b), and specifies that certain payments
made to employees "as may be usual in a particular employer-
employee relationship" may be deducted from the rates required.
21 V.S.A. § 384(c). Again, Bimbo's counterclaim essentially
seeks a deduction from the rate owed that is not based in the
text of the Vermont Employment Practices act and therefore
contravenes its remedial scheme. A common law counterclaim like
this, contrary to the FLSA, would likely also be considered
contrary to Vermont law. Even if Distributors' claim proceeds as
a state law-only claim, Bimbo's common law counterclaim is
displaced by Vermont's statutory framework.

Bimbo also argues that "it would be improper to evaluate
the propriety of" the counterclaim before the Court has
determined whether Distributors are employees entitled to FLSA
protection. ECF No. 34 at 20. Several courts have adopted this
logic, concluding that counterclaims should proceed until the
Court resolves whether plaintiffs are employees or independent
contractors. *See, e.g.*, *Carpenter v. Pepperidge Farm, Inc.*, No.
CV 20-3881, 2021 WL 780150, at *5 (E.D. Pa. Mar. 1, 2021);
*Spellman v. American Eagle Express, Inc.*, 680 F. Supp. 2d 188

(D.D.C. 2010). This is unpersuasive, because – as stated by the

Western District of Texas –

> Either (1) the evidence will show that Plaintiff was an
> independent contractor not covered by the FLSA, in which
> case there will be no FLSA recovery to activate Defendant's
> counterclaims; or (2) the evidence will show that Plaintiff
> was an employee with FLSA protections, in which case the
> FLSA will preempt Defendant's counterclaims.… Defendant's
> counterclaims are thus subject to dismissal.

*Snead v. EOG Res., Inc.*, No. 5:16-CV-1134-OLG, 2017 WL 6294875,

at *2 (W.D. Tex. Feb. 14, 2017); *see also* ECF No. 31-1 at 12-

13.[13]

Bimbo argues that its First and Fourteenth Amendment rights

preclude dismissal of its counterclaim. The Supreme Court has

explained that those Amendments establish that "[t]he filing and

prosecution of a well-founded lawsuit may not be enjoined . . .

even if it would not have been commenced but for the plaintiff's

desire to retaliate against the defendant." *Bill Johnson's

Restaurants, Inc. v. NLRB*, 461 U.S. 731, 742-43 (1983). But it

also explained that a lawsuit may be halted if it "lacks a

reasonable basis in fact or law." If the Court concludes that

Bimbo's lawsuit lacks a reasonable legal basis, it can dismiss

---

[13] Bimbo argues that *Snead* is inapplicable because the court
dismissed the unjust enrichment counterclaim on separate state
law grounds. But the *Snead* court dismissed all of the
counterclaims on the catch-22 logic quoted here, and offered
*additional* state law ground for dismissal of the unjust
enrichment claim. *See Snead*, 2017 WL 6294875 at *3.

the lawsuit without violating Bimbo's First Amendment rights. The fact that a federal law preempts or otherwise precludes certain counterclaims cannot be considered a violation of the First Amendment; otherwise, the judiciary would be unable to dismiss any lawsuits based on federal preemption or incompatibility with statutory schemes, something that courts do as a matter of course. Additionally, as DOL notes, the Supreme Court's concern in *Bill Johnson* was that the litigant would be "totally deprived of a remedy for an actual injury," which is not the case here: Bimbo will still be able to litigate its defenses, including offsets against its ultimate liability under the remedial scheme discussed above.

Finally, Bimbo argues that denial of the counterclaim will violate its Fifth Amendment rights because civil penalties are unconstitutional when they are so severe as to be disproportionate to the offense and "wholly unreasonable." ECF No. 47 at 24 (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919)). But Distributors' and DOL's argument is not that Bimbo must pay an independent and additional wage beyond the claimed unpaid overtime. Instead, they argue that actions which seek to reduce FLSA liability by clawing back employment agreements pursuant to state common law are contrary to the text, structure, and purpose of the FLSA, and are therefore preempted. Employers may certainly argue that they

have paid (alleged) employees in a manner that should offset their FLSA liability, but they may not seek to recoup *all* benefits that they allegedly conferred to a plaintiff on the basis of a misclassification.

### Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings (ECF No. 19) is **denied.** Distributors' and DOL's motions to dismiss the counterclaim (ECF Nos. 31, 44) are **granted.** Defendant's motion for leave to file a sur-reply brief (ECF No. 38) is **denied** as moot.

DATED at Burlington, in the District of Vermont, this 4th day of December, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge